UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

POTTER SOUTH EAST, LLC,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀⠀No. 3:19-CV-335-HBG
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
UNIFIRST CORPORATION,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀⠀⠀)

## **MEMORANDUM OPINION**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 21].

This case was tried before the undersigned during a two-day bench trial beginning on July 6, 2021. Attorneys Andrew Tillman and Charles Sharrett appeared on behalf of Plaintiff, and Attorney J. Cole Dowsley, Jr., appeared on behalf of Defendant. Following the bench trial, the parties submitted proposed Findings of Fact and Conclusions of Law [Docs. 60, 61]. In addition, Plaintiff filed a Motion for Adverse Inference Regarding Spoilation of Evidence Against Defendant ("Motion for Adverse Inference") [Doc. 59] and an Objection to Defendant's Post-Trial Brief ("Objection") [Doc. 63]. Accordingly, for the reasons stated below, the Court **FINDS** in favor of Plaintiff in that a legally enforceable contract was never formed between the parties, and thereby, the Court **DENIES AS MOOT** Plaintiff's Motion for Adverse Inference and Objection [**Docs. 59, 63**].

1

## I.      BACKGROUND

The central issue in this case is whether the parties formed a contract.  Specifically, Casey Emmons ("Emmons"), Plaintiff's employee during the relevant time period, signed a customer service agreement ("Service Agreement") with Defendant for uniforms.  Plaintiff claims the contract was between Emmons and Defendant.  Defendant claims the contract was between it and Plaintiff, and because the Service Agreement contains an arbitration agreement, Defendant states that this case must be arbitrated.

The case centers on what occurred between Emmons and Defendant's sales representative, Dominic Rapton ("Rapton").  Emmons signed the Service Agreement on March 9, 2017, but shortly afterwards, on May 8, 2017, he informed Defendant that he and the other employees wanted to return the uniforms and cancel any future service.  After the uniforms were returned, Defendant attempted to collect money from Plaintiff via a debt collection agency and a lawsuit filed in the Circuit Court of Knox County.  Defendant voluntarily dismissed its state court action.

Subsequently, Defendant attempted to convene an arbitration between the parties pursuant to the terms of the Service Agreement.  In response, Plaintiff filed a declaratory action in the Chancery Court of Knox County, Tennessee, to challenge the arbitration action.  Defendant removed the case to the instant forum pursuant to 28 U.S.C. § 1332(a).  The parties agreed to stay the arbitration action pending a decision on whether a legally enforceable contract exists between them.  [Doc. 30].

## II.     TESTIMONY

During the bench trial, Plaintiff presented the testimony of Emmons, Jeffrey Cummins, Heath Griffith, and William Dwayne Potter.[1]  Defendant presented the testimony of Rapton and

---

[1] Plaintiff also read portions of Bryan Mendenhall's deposition testimony during the trial.

Bryan Mendenhall.  The Court will summarize the testimony presented at the trial in the order in which it was presented.

**A.      Casey Emmons**

Emmons testified that he was the foreman of Plaintiff's concrete plant during the relevant time period.  [Doc. 56 at 23].  Emmons has a tenth-grade education.  [*Id.* at 20].  Emmons's duties while working for Plaintiff included batching concrete, loading trucks, washing the trucks, and making sure the trucks made it to the worksite.  [*Id.* at 23].  Emmons had authority to make minor purchases, such as purchasing paper towels, but he did not have the authority to make major purchases.  [*Id.* at 25-26].  Emmons had to go through William Dwayne Potter ("Potter"), Plaintiff's owner, to make larger purchases.  [*Id.*].

Emmons met with Rapton, Defendant's sales representative, at an office trailer located at the concrete plant.  [*Id.* at 27-28]. Emmons testified that Potter did not want to be involved with the uniforms.  [*Id.* at 28].  Emmons stated that he passed that information along to Rapton and that he (Emmons) was pretty sure Rapton was in the trailer office when Emmons called Potter about the uniforms.  [*Id.* at 28-29].  Emmons signed the Service Agreement [Ex. 1] on March 9, 2017.  Emmons testified that he understood that each employee contracted with Defendant for the uniforms.  [Doc. 56 at 29].  Emmons maintained that the Service Agreement had nothing to do with Plaintiff.  [*Id.* at 30].  Emmons testified that the top portion had not been completed when he signed the Service Agreement.  [*Id.* at 31].[2]

Emmons stated that the Employee Responsibility Form [Ex. 5] is consistent with his understanding that Defendant contracted with the employees for uniforms.  Emmons stated that he is listed as the supervisor on the Employee Responsibility Form, but he never told Rapton that he

_____

[2] The top portion of the Service Agreement lists Potter South East as the "Company Name (Customer)" [Ex. 1] and includes its address and telephone number.

was the supervisor.  Emmons understood that the employees would pay for their own uniforms, consistent with the statements in Defendant's Phone Verification for Uniform Accounts [Ex. 6]. [Doc. 56 at 36].  Emmons stated that he later prepared a list of employees who quit, or were laid off, or were hurt [Ex. 15] because the employees were supposed to be able to bring their uniforms back and "be done with it."  [Doc. 56 at 37].  Emmons reported such employees to Justin Hale ("Hale"), Defendant's route driver, who picked up and dropped off the uniforms.  [*Id.* at 38].

Emmons stated that Defendant made the first delivery of uniforms on April 20, 2017.  [*Id.* at 39].  On May 8, 2017, Emmons sent Defendant a letter ("May 8 Letter") [Ex. 14] terminating Defendant's services.  [Doc. 56 at 40].  The May 8 Letter states as follows:

> My name is Casey Emmons and I am employed by Potter South East LLC in Huntsville, TN.  Myself and other employees were recently in communication with Dominic Rapton about signing up for uniforms.  I made sure, and have witnesses, that he was told that NO contract would be signed, and that our employer was not interested in a contract since this was not a company wide project, as several of the employees here had expressed interest in uniforms.  Our employer expressed that as long as payment was debited weekly from our payroll every week, it was ok.  We expressed multiple times that we were not interested in signing a contract, as this had nothing to do with Potter South East, but us employees as individuals.  He agreed and stated that it was a "service agreement" and not a contract.  He stated that we could turn them in and return them, no questions asked.  I also stated to Dominic that I would not be handling any part of the payment process, that it has to [be] an employee paycheck debit only.  He agreed and said he would talk to the office and get it set up.  No one in the office was ever contacted. I have now realized that Dominic was trying to pass the paperwork off on Potter South East.  It was expressed multiple times that Potter South East DID NOT want any responsibility on this matter, this was strictly employee mandated.
>
> After uniforms were delivered, I found out that forms were never sent from the office.  I sat down and read through the paperwork again and saw that he had indeed set it up as a company decision, which I had no authority sign for.  I am the manager of Potter Ready Mix Concrete, the division of Potter South East that orders and delivers concrete, I am not an officer manager of any kind and have

> no authority to sign such documents. Anything contract related has to be signed by the owner, Dewayne Potter himself, and he DID NOT.
>
> The reason for this letter was to express our discontent with Dominic Rapton's tactics and lies to gain a sale from our employees. He brought uniforms that were stained on the necks with black residue, and after 4 weeks, we have employees who still have not received their uniforms. With that said, we are turning our uniforms back in. Please help us in this matter, as we were deceived greatly and are very unhappy with Unifirst. Thank you for your help in this matter.

[Ex. 14]. Emmons stated that he included a list of employees who agreed with the May 8 Letter. [Doc. 56 at 43].

Emmons explained that he sent the May 8 Letter because he and the other employees were having issues with the uniforms, and when he retrieved his paperwork, he saw that he had signed a contract listing "Potter South East" on the document. [*Id.* at 40]. He identified the paperwork as Exhibit 13, which is a letter to Plaintiff from Defendant's customer service representative post-marked April 24, 2017. [*Id.* at 41]. Emmons acknowledged that he did not read Exhibit 13 very well. [*Id.* at 42]. He testified that in his May 8 Letter, he was invoking the language in the Employee Responsibility Form [Ex. 5], which states as follows: "I may also elect to terminate uniform services with Unifirst at any time; provided ALL garments are returned to Unifirst and Unifirst personnel are notified." [Doc. 56 at 43]. Emmons testified that he told Rapton multiple times that he did not have authority to sign on Plaintiff's behalf. [*Id.* at 47].

During cross examination, Emmons agreed that he testified in his deposition that he was the general manager of the concrete plant. [*Id.* at 49]. Emmons stated that prior to meeting with Rapton, he met with a lady employed with Defendant, and then a few months later, Emmons called Defendant to inquire about employee uniforms. [*Id.* at 53]. In response to Plaintiff's telephone call, Defendant sent Rapton to meet with Emmons. [*Id.*]. Emmons met with Rapton about three

times before Emmons signed any documents. [*Id.* at 54]. Emmons stated that he also discussed the arrangement with Potter, and Potter agreed to have the uniform payment deducted from employees' checks, but he did not agree to the deal. [*Id.*]. Emmons stated that he told Rayna, who works in Plaintiff's office, that Potter approved the paycheck deductions for the uniforms. [*Id.* at 56].

Emmons testified that he did not have the authority to sign the Service Agreement [Ex. 1] on behalf of Plaintiff, but he signed it anyways because he did not read it. [Doc. 56 at 58]. Emmons testified that he drafted the May 8 Letter, but Rayna in Plaintiff's office typed it so that it would look professional. [*Id.* at 61-62].

Emmons stated that Hale conducted a preinstallation visit on April 13, 2017, and Hale met with Emmons. [*Id.* at 63]. Emmons acknowledged that he signed the Route Sales Representative Pre-Installation Visitation [Ex. 4] but does not recall seeing "Casey/Dwayne" under the heading, "Introduction to individual who signed the Agreement." [Doc. 56 at 63]. Emmons stated that he received Defendant's invoices [Ex. 8] and signed them on behalf of the employees. [Doc. 56 at 69].

## B. Jeffrey Cummins

Jeffrey Cummins ("Cummins") testified that he previously worked for Plaintiff as a driver. [*Id.* at 78]. Cummins stated that during his time working for Plaintiff, Defendant supplied work uniforms. [*Id.* at 79]. Cummins understood that he was going to pay for the uniforms out of his paycheck and that he could cancel the contract at any time because the work was not consistent enough to support a full contract. [*Id.*]. Cummins signed the Employee Responsibility Form [Ex. 5, Bates No. 106] on March 9, 2017. [Doc. 56 at 80]. Cummins stated that he believed he could terminate the contract at any time because the Employee Responsibility Form states, "I may also

6

elect to terminate uniform service with UniFirst at any time; provided ALL garments are returned to UniFirst and UniFirst personnel are notified." [*Id.* at 81]. Cummins did not believe that Plaintiff was bound to the contract, only the employees signing it, and that by signing, Plaintiff could deduct the amount due for the uniforms from the employees' paychecks. [*Id.* at 82]. Cummins stated that the salesman, "Dom," told them that they could cancel anytime they wanted. [*Id.*]. Cummins testified that he signed Exhibit 14, the list of people who terminated Defendant's services, but he did not see the May 8 Letter. [*Id.* at 83].

Cummins believed that Plaintiff would deduct the price of the uniform from the employees' paychecks. [*Id.* at 86]. Cummins testified that Emmons stated that the employees had to turn the uniforms back in, and because Emmons was his supervisor, Cummins went along with it. [*Id.*].

### C.    Heath Griffith

Heath Griffith ("Griffith") testified that he previously worked for Plaintiff as a truck driver, and his direct supervisor was Emmons. [*Id.* at 90]. While Griffith was working for Plaintiff, he received a uniform, and the uniform was supposed to have been paid for by the employee. [*Id.* at 91]. Griffith signed the Employee Responsibility Form [Ex. 5, Bates No. 107] on March 9, 2017. [Doc. 56 at 91]. Griffith's understanding was that Plaintiff would take the money out of the employee's paycheck and pay Defendant. [*Id.* at 92]. Griffith stated that he did not think about the language in the Employee Responsibility Form relating to the termination of Defendant's services as he immediately turned in his uniform because it was too hot to work in. [*Id.*]. Griffith did not think of the agreement as a contract, and Emmons told Griffith and another driver, "Potters ain't going to do no contract." [*Id.* at 93]. Griffith acknowledged his signature on Exhibit 14

("People That are Terminating Their Services") and that because he turned in his uniform, he understood that he was no longer liable for payment. [*Id.* at 93-94].

### D. William Dwayne Potter

Potter testified that he owns and manages Plaintiff. [Doc. 56 at 166]. Potter stated that he makes most of Plaintiff's buying decisions, except minor purchases. [*Id.*]. Potter also decides what projects to bid on. [*Id.* at 167]. In March 2017, Emmons operated a concrete plant for Plaintiff, which involved supervising the employees, but he did not supervise the road building crews. [*Id.* at 167, 168]. Potter stated that Emmons never purchased anything and that all purchasing had to be done in the Huntsville office. [*Id.* at 169]. Potter testified that Emmons is not Plaintiff's officer, director, or general manager and that he had no authority to enter contracts on behalf of Plaintiff. [*Id.* at 170]. Potter testified that he heard some chatter about getting uniforms and that he made it clear to Emmons that Plaintiff was not liable for anything involving uniforms. [*Id.* at 171].

Potter testified that Plaintiff did not handle the payroll and that as such, he could not deduct the costs for the uniforms from the payroll. [*Id.* at 173-74]. Potter testified that at no point did Plaintiff ever withhold money for the uniforms from payroll. [*Id.* at 174]. Potter also testified about the state court action between the parties. [*Id.* at 174-75].

On cross examination, Potter testified that he guessed that Emmons was a manager but that he really does not know the definition of a "manager." [*Id.* at 177]. Potter stated that Emmons was responsible for batching concrete, preparing the trucks for orders, talking to the other foremen on the job, and communicating for the deliveries. [*Id.*]. Potter agreed that Emmons supervised other employees and that Emmons monitored the maintenance of the concrete plant. [*Id.*]. Potter stated that he told Emmons, "I'm all for you-all getting uniforms if that's what you want. You've

got to shield Potter from any responsibility." [*Id.* at 179]. In addition, Potter testified that the payroll deduction had to be approved through FrankCrum (a third-party payroll processing firm hired by Plaintiff) and that if FrankCrum approved of the payroll deduction, and Plaintiff did not have to hire anyone to keep up the uniforms or be involved in the agreement, then the employees could get uniforms. [*Id.*]. Potter maintained that Plaintiff was not to be a part of the agreement. [*Id.* at 179-80].

Potter testified regarding an email [Ex. 18], dated April 4, 2017, that Plaintiff sent Amanda Byrge, Plaintiff's employee who oversees purchases. [Doc. 56 at 182].[3] The email states that Plaintiff is willing to proceed with the uniforms with the understanding that the employee is responsible for the cost of the uniforms and that "[i]t will be a payroll deduction ONLY." [Ex. 18, Bates No. 199]. The email continues that the first time that Plaintiff "get[s] stuck with a bill for damages or loss that is not retrievable, [Plaintiff] will terminate the uniforms." [*Id.*]. Potter testified that Emmons and the staff at the Huntsville office knew that Plaintiff was not going to take any responsibility for the uniforms and that Plaintiff would only give approval for a payroll deduction, if necessary, but the payroll deduction also had to be approved by FrankCrum. [Doc. 56. at 184]. Potter testified that Plaintiff never authorized the deduction for the employee uniforms with FrankCrum. [*Id.* at 189]. Potter testified that some of the information included in the Customer Account Application [Ex. 2] appears to be information completed by Rayna, who works for Plaintiff in the Huntsville office. [Doc. 56 at 190].

---

[3] Plaintiff objected to Exhibit 18 on hearsay grounds, but the Court will consider Plaintiff's statements in the emails pursuant to Federal Rule of Evidence 801(d)(2). The emails authored by Colleen Rowe, an employee of FrankCrum, however, are hearsay.

E.      **Dominic Rapton**

Rapton testified that he was Defendant's sales representative during the relevant time frame. [Doc. 57 at 5]. As Defendant's sales representative, Rapton's duty was to find new business for the company, which included maintaining a database of clients or prospects, trying to set appointments, meeting with potential clients and establishing relationships, and providing solutions for the company. [*Id.* at 6]. Rapton testified that one day when he was working, his general manager, Bryan Mendenhall, approached him and gave him a post-it note and stated, "Hey, this company, Potter South East, a gentleman by the name of Casey called, and he wants – he's interested in some uniforms." [*Id.* at 7]. Rapton called Emmons, and they scheduled a meeting. [*Id.* at 8-9]. Rapton testified that he and Emmons met in a mobile office close to the interstate expressway. [*Id.* at 9]. Rapton brought a catalog of uniforms with him. [*Id.*].

Rapton testified that Defendant trained its sales representatives to determine who the decision-maker is at a company. [*Id.* at 10]. Rapton stated that Emmons introduced himself as a manager of the construction area and another construction site and stated that he "managed all these employees." [*Id.*]. Emmons told Rapton that the employees wanted uniforms, and Emmons never told Rapton to go to some other office in relation to their uniform deal. [*Id.* at 11]. Rapton testified:

> One thing we're taught at Unifirst is to find out, you know, where the company's offices are. And I realize – I realize that that's, like, a temporary mobile office that they were in, so I'm like, "Hey, where's your corporate office at?" And [Emmons is] like, "Huntsville, Tennessee." And I'm like, "Well, is there anybody down there that I – you could connect me to?" And he actually was like, "No, don't go down there." He, like, directed me to not go to their home office.

[*Id.*]. Rapton stated that he is not sure why Emmons instructed him not to go to the corporate office, but Rapton thought that "[i]t was strange." [*Id.*]. Rapton stated that he did not have any

telephone conversations with Potter, and he does not recall Emmons having any telephone conversations with Potter. [*Id.* at 12-13]. Rapton stated that Emmons just told him that he was the manager of the department, the manager of the people who were interested in the uniforms, and that he was the decision-maker. [*Id.* at 12]. Rapton testified that after the initial meeting, he scheduled a follow-up meeting to obtain the employees' sizes. [*Id.* at 13].

Rapton testified that Emmons signed the Service Agreement [Ex. 1] in Rapton's presence. [*Id.* at 15]. Prior to Emmons signing the Service Agreement, Rapton explained the bullet points that are provided on the back of the agreement. [*Id.*]. Rapton stated that he completed the top portion of the Service Agreement before Emmons signed it and that he would not have anyone complete a blank agreement. [*Id.* at 17]. Rapton stated that Emmons never said he was not authorized to sign the Service Agreement or that someone else needed to sign the Service Agreement. [*Id.*]. Rapton stated that he did not have any reason to believe that Emmons was not authorized to sign the Service Agreement. [*Id.* at 18]. Rapton testified that Defendant never entered into a contract with individual employees during the time he worked for Defendant. [*Id.*].

Rapton stated that Emmons asked if Defendant could do an employee deduct for the uniforms, which Rapton stated that he could. [*Id.* at 21]. Rapton stated that once the forms were signed, his sales manager, Bob DeTorres, told him to send the forms to Plaintiff so that Plaintiff could make sure that the payroll is deducted in the amount the employees agreed. [*Id.* at 22]. Emmons provided Rapton an email address for a lady who worked in Plaintiff's office. [*Id.* at 23]. Rapton contacted the lady, who told him, "We can't – you can't get to our payroll." [*Id.*]. Rapton responded that he did not want the payroll and that he was making sure the employee deduct was processed. [*Id.*]. The lady told Rapton a third-party handled the payroll, and she provided the contact information for FrankCrum. [*Id.*]. Rapton emailed a lady with FrankCrum. [*Id.* at 24].

Rapton also sent a screenshot [Ex. 7] to Defendant's secretary of the design that Emmons approved. [Doc. 57 at 27-28]. Rapton personally delivered the uniforms when they arrived. [*Id.* at 29].

Rapton testified that he never lied to Emmons, and when Emmons referenced Rapton's "tactics" in the May 8 Letter [Ex. 9], Rapton is not sure what "tactics" Emmons was referring. [Doc. 57 at 32]. Rapton was surprised by the May 8 Letter. [*Id.*]. Rapton stated during their meeting, Emmons asked if he had to sign a contract, and Rapton responded, "We have a service agreement" and showed him the form. [*Id.* at 34]. Rapton stated that Emmons never expressed that the contract would be with the employees and that the only issue discussed was that the employees would pay for the uniforms. [*Id.*]. Rapton testified that Emmons never expressed that Plaintiff did not want to be responsible for the uniforms and that Emmons never stated that Potter had to sign the Service Agreement on Plaintiff's behalf. [*Id.* at 34-35].

On cross examination, Rapton stated that he completed the top portion of the Service Agreement. [*Id.* at 38]. Rapton acknowledged that Emmons told him that Plaintiff was not going to supply uniforms, Plaintiff was not going to pay for the uniforms, and that if the employees were going to have uniforms, they would have to do a payroll deduction. [*Id.* at 39]. Rapton testified that Emmons is identified as the customer on the signature line at the bottom of the Service Agreement [Ex. 1]. [Doc. 57 at 41].

Rapton testified that he knew Emmons was in charge of the people in the mobile trailer and that he was not sure how many employees Emmons supervised because there were so many employees. [*Id.* at 42]. Rapton stated that generally, he would go to the main office of the company, but Emmons told Rapton not to go there, which Rapton found to be strange. [*Id.*]. Rapton never met Potter, and in the Service Agreement that Emmons signed, Emmons left his title

blank.  [*Id.* at 43-44].  The signature line on the Service Agreement includes the following "(Must be officer or owner)."  [*Id.* at 45].  Rapton stated that he was taught during his training that he must be dealing with a decision-maker, which can be a manager, officer manager, or plant supervisor. [*Id.*].

Rapton testified that after Emmons sent the May 8 Letter, he and Bryan Mendenhall visited Emmons, but Emmons ignored them.  [*Id.* at 51].  Mendenhall did not share the May 8 Letter with Rapton prior to the visit.  [*Id.*].  Rapton testified that later, he circled the sentences that were untrue in Emmons's May 8 Letter.  [Ex. 27-A].  Rapton also circled the untrue sentences in Emmons's Sworn Statement.  [Ex. 27-B].  Rapton testified that he was unable to get the employee deduction program finalized, but he supplied the uniforms anyways.  [*Id.* at 69].  Rapton testified that he does not agree with the statements that are not highlighted in the May 8 Letter or Emmons's Sworn Statement.  [*Id.* at 74].

### F.    Bryan Mendenhall

Thomas Bryan Mendenhall ("Mendenhall"), Defendant's Knoxville branch manager, oversees the service department and sales to ensure the location is profitable.  [*Id.* at 76].  With respect to Defendant's uniform program, Mendenhall testified that it begins with the sales process where the sales representative meets with the prospect and puts together a plan that fits the prospect's needs, and then, the parties sign a service agreement.  [*Id.* at 78].  The next step is to obtain the sizes of all the employees, and afterwards, Mendenhall receives the account folder, and he looks through it and approves it.  [*Id.*].  Mendenhall states that about four to six weeks later, the uniforms arrive, and Defendant delivers them.  [*Id.*].  Mendenhall states that the documents involved in the sales process include the customer service agreement, the account application, and in this case, the employment enrollment forms.  [*Id.*].

Mendenhall testified that he signs all customer service agreements, including the Service Agreement [Ex. 1] in this case. [Doc. 57 at 83]. Mendenhall stated that Defendant typically has a 60-month term, which is stated on the back of the Service Agreement. [*Id.* at 84]. Mendenhall testified that the Service Agreement also states that if there are any service deficiencies, the customer must inform Defendant in writing, and if Defendant cannot correct the deficiencies, then Defendant has "broke the agreement." [*Id.* at 85]. Mendenhall testified that Plaintiff never provided written notice about any uniform deficiencies. [*Id.*]. Mendenhall further stated that there is an arbitration provision on the back of the Service Agreement and that there is currently a pending arbitration case between the parties. [*Id.* at 87]. Mendenhall testified that he signed the Service Agreement on March 17, 2017, after he gave Rapton time to "size the account" (*i.e.*, obtain the employees' sizing information). [*Id.* at 88].

Mendenhall also testified that the purpose of the Customer Account Application [Ex. 2] is to perform a credit check on all of Defendant's customers. [*Id.* at 89]. In addition, Mendenhall testified that the Employee Responsibility Form [Ex. 5] is for the benefit of the employer in order to handle the payroll deduction. [*Id.* at 90]. Mendenhall testified that once the Employee Responsibility Form is completed, Defendant gives it back to the customer so that the customer can set up the employee payroll deduction. [*Id.*]. Mendenhall testified that "payroll deduct" means that the company takes the money out of the employee's paycheck each week, but Defendant is paid by the company/customer. [*Id.* at 91]. Mendenhall stated that the purpose of the provision on the Employee Responsibility Form regarding termination (*i.e.*, "I may also elect to terminate the uniform service with Unifirst at any time, provided all garments are returned to Unifirst and UniFirst personnel are notified") is for the employee who is getting money taken out of his/her check, so once the employee returns the uniform, he/she is no longer responsible for paying that

money. [*Id.* at 93]. Mendenhall further explained that the termination provision does not affect the customer's obligations to Defendant. [*Id.*].

Mendenhall stated that Exhibit 4 ("Route Sales Representative Pre-Installation Visitation") is the preinstall visitation form, which Hale, Defendant's route driver, signed. [*Id.* at 96]. Mendenhall testified that the driver makes a preinstall visit to determine where the uniforms will be kept, so when the driver returns the following week, he/she is already set up for the delivery. [*Id.* at 97]. Mendenhall stated that Defendant supplied the uniforms for less than a month before receiving the May 8 Letter. [*Id.* at 97-98]. When Mendenhall received Emmons's May 8 Letter, Mendenhall called Emmons to try to schedule an appointment in order to save the account. [*Id.* at 98-99]. Mendenhall and Rapton went to visit Emmons, but Emmons ignored them. [*Id.* at 98]. Mendenhall went back to visit with Emmons without Rapton, and Emmons complained that Rapton had lied to him and reiterated the contents in the May 8 Letter. [*Id.* at 99].

Mendenhall testified that Defendant never enters into agreements with individual employees. [*Id.* at 100-01]. Mendenhall testified that he had no reason to believe that Emmons was unauthorized to enter into the agreement. [*Id.* at 101]. Mendenhall stated that after Defendant picked up the uniforms, he turned the account over to collections. [*Id.*]. Mendenhall stated that afterwards, the collection company sent the information to its attorney, who filed an action in state court. [*Id.* at 102].

On cross examination, Mendenhall testified that he wrote off the debt about ninety (90) days after Emmons sent the May 8 Letter. [*Id.* at 114]. In order to write off the debt, Mendenhall completed a form [Ex. 24], wherein he stated that the customer laid off 90% of the employees and wanted to cancel the service. [*Id.*]. Mendenhall testified that he provided that reason because Emmons provided Defendant a list of people who were fired or were laid off. [*Id.* at 115].

15

Further, Mendenhall stated that he never talked to Potter and anyone at Plaintiff's office. [*Id.* at 126]. Upon questioning from the Court, Mendenhall stated that the customer service agreement is not fully executed until he signs it. [*Id.* at 130]. Mendenhall stated that at the time he signed the Service Agreement, he had not talked to Emmons. [*Id.*].

## III.    ANALYSIS

Accordingly, for the reasons more fully explained below, the Court **FINDS** in favor of Plaintiff, and specifically, **FINDS** that there is not a legally enforceable contract between the parties.

The Court will begin with an overview of the relevant law and then turn to its findings of fact and conclusions of law.

### A.    Overview

Both parties brief Tennessee law in their proposed Findings of Fact and Conclusions of Law. The Court agrees that Tennessee law is applicable. As mentioned above, the central issue in this case is whether the parties formed a contract for the purchase of uniforms. Plaintiff asserts that it did not contract with Defendant, and Defendant submits that Emmons was acting within his actual or apparent authority to contract on behalf of Plaintiff.

There are two bases under which the common law attributes the legal consequences of an agent's actions to the principal: actual authority and apparent authority. *Savage v. City of Memphis*, 464 S.W.3d 326, 333 (Tenn. Ct. App. 2015) (citing *Milliken Grp., Inc. v. Hays Nissan, Inc.,* 86 S.W.3d 564, 567 (Tenn. Ct. App. 2001). "An agent's actual authority consists of the powers which a 'principal directly confers upon an agent or causes or permits him to believe himself to possess.'" *Id.* (quoting *Milliken Grp.*, 86 S.W.3d at 564) (other citations omitted). Actual authority "flows from the manifestations of the principal to the agent." *Id.* (citing *Milliken*

*Grp.*, 86 S.W.3d at 564). "Apparent authority is essentially agency by estoppel, in that its creation and existence depend on some conduct by the principal that will preclude him from denying liability for the acts of the agent." *Id.*

A party seeking to establish apparent authority must show three elements: (1) the principal knew or negligently acquiesced in the agent's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment. *Id.* at 334. (other citations omitted). "[A]pparent authority is established through acts of the principal rather than those of the agent." *Id.* The Tennessee Supreme Court has explained as follows:

> The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority. The liability of the principal is determined in any particular case, however, not merely by what was the apparent authority of the agent, but by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent.

*Id.* (quoting *Boren ex rel. Boren v. Weeks,* 251 S.W.3d 426, 432-33 (Tenn. 2008)).

With the above law in mind, the Court will now turn to the findings of fact and conclusions of law.

## B.      Findings of Fact

Based on the testimony presented at the hearing and the exhibits admitted into evidence, the Court **FINDS** the following facts:

Plaintiff is a construction company with its main office in Huntsville, Tennessee.  Plaintiff has only one member, Potter, who is the sole owner.  Plaintiff often contracts with the State of

17

Tennessee, Department of Transportation ("DOT") on road construction projects. In 2017, Plaintiff had a contract with TDOT to widen Interstate 75 near Caryville, Tennessee, as well as other smaller projects in the area. To support its projects in the area, Plaintiff installed and began to operate a ready-mix concrete plant near exit 141, Huntsville/Oneida, off of Interstate 75. Defendant is a company that provides uniform services throughout the United States and has a branch in Knoxville, Tennessee.

Emmons worked for Plaintiff in 2017 as a manager or supervisor of the ready-mix concrete plant. Emmons primarily performed manual labor, but he also supervised the employees at the concrete plant. Emmons had authority to make minor purchases, but he did not have authority to make larger purchases. Only Potter could make larger purchases.

Emmons was interested in uniforms, so he contacted Defendant. In response, Rapton visited Emmons on March 9, 2017. Emmons and Rapton met in a mobile trailer at the concrete site, away from Plaintiff's corporate office. Pursuant to his training as a sales representative, Rapton asked Emmons where the corporate office was located and further asked if there was anyone in the office he could contact. Emmons told him that the corporate office was in Huntsville, Tennessee, but that Rapton could not go to the corporate office, which Rapton thought was strange. Despite this red flag, Rapton proceeded to meet with Emmons with respect to entering into a service agreement for uniforms.

During the meeting, Emmons inquired whether he would be signing a contract, and Rapton explained that it was a service agreement. Emmons also inquired about payroll deduction because Plaintiff did not want to be involved in the process, and Plaintiff was not going to supply the uniforms. Rapton confirmed that Defendant could setup a payroll deduction for the cost of the

uniforms.  Given this information, Emmons believed that he signed the Service Agreement on behalf of himself and the other employees who wanted uniforms on March 9, 2017.  [Ex. 1].

On the same day, March 9, 2017, several employees completed the Employee Responsibility Form, so that Defendant could obtain the employees' sizes.  *See* [Ex. 5].  Pursuant to the terms of the Service Agreement, it did not become effective until it was signed by Bryan Mendenhall, which occurred on March 17, 2017.  *See* [Ex. 1] ("This Agreement is effective when signed by both the Customer and UniFirst Location Manager . . .").  At the time Mendenhall signed the Service Agreement, he had never talked to Emmons or made an investigation as to whether Emmons had authority to act on Plaintiff's behalf.

Rapton obtained other employees' sizes in April 2017.   [Ex. 5].  Two other employees, Cummins and Griffith, signed Employee Responsibility Forms because they thought they were entering service agreements with Defendant.  In addition, Cummins and Griffith believed that they could terminate at any time, given the following language on the Employee Responsibility Form, "I may also elect to terminate uniform services with UniFirst at any time; provide ALL garments are returned to UniFirst and UniFirst personnel are notified.  Any garments not returned will be deduced from my weekly paycheck."  [Ex. 5].

Subsequently, on April 13, 2017, Hale performed a preinstallation visit, and Emmons acknowledged that he signed the Route Sales Representative Pre-Installation Visitation, which states that Hale met "Casey/Dwayne."  [Ex. 4].  It is not clear to the Court, however, if Hale met Potter because Hale did not testify at the trial, and Emmons does not recall seeing that language.

Further, Emmons provided Rapton with contact information for an individual who worked in Plaintiff's office so that Defendant could up the payroll deduction.  Subsequently, on May 3, 2017, Rapton emailed Colleen Rowe, an employee for FrankCrum, asking about the payroll

deduction for the employee uniforms. [Doc. 18]. Rapton was never able to get the payroll deductions approved, and despite not setting up the payroll deductions, Defendant delivered the uniforms.

A few weeks later, Emmons decided that he no longer wanted the uniforms, and he drafted the May 8 Letter and mailed it to Defendant. He included a list of employees that were also terminating Defendant's services. After receiving the May 8 Letter, Mendenhall met with Emmons in an attempt to save the account: once with Rapton and later, without Rapton. Mendenhall was unable to save the account.

### C. Conclusions of Law

Based on the above findings of fact, the Court **FINDS** the following conclusions of law.

The Court will start with actual authority and then address apparent authority. The Court finds that the evidence is clear that Emmons did not have actual authority to act on behalf of Plaintiff. As mentioned above, with respect to actual authority, the principal must confer authority upon the agent or cause the agent to believe that he/she has authority. Both Potter and Emmons testified that Emmons was not signing on behalf of Plaintiff and that Plaintiff did not want to be part of the agreement with Defendant. Emmons acknowledged that he had no authority to enter into any contracts on behalf of Plaintiff, including the Service Agreement with Defendant. Accordingly, the Court finds that Emmons did not have actual authority to enter into any contracts on behalf of Plaintiff.

The Court will now turn to whether Emmons had apparent authority. After considering the elements above, the Court finds that Emmons did not have apparent authority to act on behalf of Plaintiff. As mentioned above, in order to establish apparent authority, the following must be shown: (1) Plaintiff, knew or negligently, acquiesced in Emmons's exercise of authority, (2)

Rapton had knowledge of the facts and a good-faith belief that Emmons possessed such authority, and (3) Rapton relied on this apparent authority to his detriment. While Rapton relied on Emmons's alleged apparent authority to his detriment, the Court finds the other two elements have not been established.

First, the Court finds that it is clear in this case that Plaintiff did not knowingly or negligently acquiesce in Emmons's exercise of authority. Here, there was no conduct on the part of Plaintiff that indicated Emmons had such authority. In fact, Rapton and Mendenhall testified that neither of them contacted Potter regarding the Service Agreement. *Hart v. First Nat. of Memphis*, 690 S.W.2d 536, 539 (Tenn. Ct. App. 1985) ("Thus, plaintiffs cannot hope to establish apparent authority under the first definition, because agency cannot be proved by the declarations of the supposed agent."). Instead, the evidence establishes that Potter did not want to be part of the service agreement, and Emmons knew that Plaintiff did not want to be involved.

Defendant argues that Emmons referred to himself as a "manager" and told Rapton that he supervised many employees. Emmons's managerial authority, however, was quite limited. Potter did not permit Emmons to make large purchases, and Emmons agreed that he was only allowed to make minor purchases. The unrebutted testimony shows that Emmons was simply a manager or supervisor of one of Plaintiff's ready-mix concrete plants. Emmons was not in charge of Plaintiff's general operations, and he did not believe that he was in charge of such operations. In addition, Potter explicitly told Emmons that Plaintiff would not be involved in any agreement for uniforms. Emmons was aware that he did not have any authority to enter an agreement on behalf of Plaintiff. While some witnesses, including Potter, described Emmons as a "manager" or a "supervisor," the Court does not find this title, especially in this case, warrants a finding of apparent authority.

Accordingly, the Court finds that the evidence fails to establish that Plaintiff knowingly or negligently acquiesced in Emmons's exercise of authority.

Second, the Court finds that Rapton did not have a good-faith belief that Emmons possessed the authority to enter the Service Agreement on behalf of Plaintiff. Rapton was trained to determine who had decision-making authority to enter into service agreements. As part of his training, Rapton was supposed to inquire about the location of a company's corporate office. When Rapton met with Emmons, Emmons took him to a temporary mobile office, so Rapton asked where Plaintiff's corporate office was located and asked if there was a contact at the corporate office. Emmons told Rapton that he (Rapton) could not visit the corporate office. During the trial, Rapton acknowledged that he thought this was strange, and the Court observes that Rapton never followed up on why he was not allowed to contact anyone at the corporate office of Plaintiff. Rapton should have known, prior to entering into the Service Agreement, that Emmons did not have the authority to contract on behalf of Plaintiff.

More importantly, however, is that Emmons told Rapton that the arrangement had to be set up as an employee payroll deduction because Plaintiff did not want to supply uniforms. Defendant argues that during trial, Potter conceded that Plaintiff agreed to proceed with the uniform program via a payroll deduction. Potter testified, however, that he would approve of an employee deduction, but Plaintiff wanted nothing to do with any contract for uniforms.

Further, Defendant argues that the relevant documents support that Emmons had apparent authority. The Court disagrees. With respect to the Service Agreement, the customer at the top of the document states "Potter South East," but Emmons did not complete the information about his title at the bottom of the agreement. Mendenhall, who approved the Service Agreement, should have inquired as to why such information was not complete. The Court finds that Mendenhall did

not sufficiently inquire as to whether Emmons had authority to contract on behalf of Plaintiff. Further, even though "Potter South East" is listed as the customer on the top of the Service Agreement, and Emmons signed it, such evidence does not bind Plaintiff in this case for the reasons explained above. *Bells Banking Co. v. Jackson Ctr., Inc.,* 938 S.W.2d 421, 424 (Tenn. Ct. App. 1996) ("It is well settled that apparent authority must be established through the acts of the principal rather than those of the agent.")

Defendant argues that Plaintiff approved of Defendant doing a credit check. Potter testified that it appeared someone (Rayna) in his office completed the paperwork; however, the Court did not hear anyone testify as to why Rayna completed the paperwork and whether she knew if Defendant was attempting to enter into a contract with Plaintiff. Defendant also relies on an email [Ex. 18], wherein Plaintiff told Amanda Byrge that it is willing to proceed with the uniforms with the understanding that the employee is responsible for the cost of the uniforms and that "[i]t will be a payroll deduction ONLY." The Court finds this email is consistent with Potter's and Emmons's testimony in that Plaintiff's only involvement was to approve a payroll deduction (if FrankCrum approved), but Plaintiff was not part of this Service Agreement with Defendant. Accordingly, based on the evidence in this case, the Court does not find that Defendant had a good faith belief that Emmons possessed authority to enter the Service Agreement on Plaintiff's behalf.

In summary, the Court finds the evidence is wholly insufficient to bind Plaintiff to the Service Agreement. Defendant did not attempt to contact Potter, the sole owner of Plaintiff, or anyone working in Plaintiff's corporate office. Emmons knew that he did not have the authority to enter into any contracts on behalf of Plaintiff, and Emmons told Rapton that the uniform agreement had to be set up as a payroll deduction program because Plaintiff did not want to supply

23

uniforms.  None of the documents in this case show otherwise.  Accordingly, the Court finds that Plaintiff and Defendant do not have a legally enforceable contract.

## IV.     CONCLUSION

For the reasons explained above, the Court **FINDS** in favor of Plaintiff, and specifically, the Court **FINDS** that the parties did not enter into a legally enforceable contract.  Given the Court's finding, the Court finds it unnecessary to address Plaintiff's request for an adverse inference based on Defendant's alleged spoilation and Plaintiff's Objection to Defendant's Post Trial Brief.  Accordingly, the Court will enter Judgment in favor of Plaintiff and Plaintiff's Motion for Adverse Inference Regarding Spoilation Evidence Against Defendant [**Doc. 59**] and Objection to Defendant's Post Trial Brief [**Doc. 63**] are **DENIED AS MOOT.**

ORDER ACCORDINGLY.

United States Magistrate Judge

24